## Commonwealth of Pennsylvania *v.* Richard Little, Appellant.

*Criminal libel—Privileged communications must be made in a proper manner.*

Communications otherwise privileged lose that privilege if the manner of the publication be improper.

A public journalist in pointing out for the benefit of the public the political corruptions of the day and the men who practice them, must perform his task in such a manner as to bring the teacher within the privilege guaranteed to him under the constitution; he may not indulge in either exuberant fancy or vituperations.

*Rejection of evidence subsequently admitted not error.*

The rejection of evidence is not reversible error when the record shows that all the facts offered to be proved in the offers which were rejected were afterwards admitted, and that the appellant had all the benefit of the testimony which he could have had, if it had been received under the rejected offers.

Argued Dec. 11, 1899. Appeal, No. 48, Jan. T., 1900, by defendant, from sentence of Q. S. Lackawanna Co., Oct. T., 1899, No. 245, on verdict of guilty. Before RICE, P. J., BEAVER, ORLADY, W. W. PORTER, W. D. PORTER and BEEBER, JJ. Affirmed. Opinion by BEAVER, J.

Indictment for libel. Before EDWARDS, J.

It appears from the record that Richard Little, editor and proprietor of the Scrantonian, was indicted for criminal libel

against Ezra H. Ripple, then serving as postmaster of Scranton. A true bill was also found against M. J. O'Toole.

Among the libelous articles complained of, published in the Scrantonian, was the following editorial, which, at the trial, Mr. Little admitted that he wrote himself: "Colonel Ripple, the man who struts around as an old soldier, although he never fought in the war, the man who was captain of the firing squad that shot down the strikers on Lackawanna avenue twenty-two years ago, but was absent in a cellar or somewhere else when the fighting was in progress; Colonel Ripple, the man who, as Connellism's chief director, has done more to debauch politics in this county than any one else, and the man who, in spite of the fact that he holds office as a Republican, has done all that lay in his power to defeat the party he benefits by. This man who is literally steeped in political corruption and blackest hypocrisy has, we understand, given orders to the editor of the Scranton Tribune that he is to fight us to the bitter end. We give him full credit for being chuck full of vicious malice and unmanly methods, and there are hundreds of reputable men in this city who will heartily indorse us. It can laugh at your childishness, spurn your malice, deplore your hypocrisy, pity your cowardice, regret your depravity, and sincerely thank God that the power of Connellism and all the dirty crew who have so long bull-dozed and misled the people, through its agency, has been broken."

In a subsequent article the following are some of the charges made by defendant in his paper against the prosecutor: "But, what can you expect with Ezra (Hog) Ripple dictating its policy? That miserable hillock of spleen and selfishness is enough to sicken any self-respecting man, but the people have got his measure long ago. We have an old veteran by the name of Jeremiah here, who wanted to be janitor of No. 19 school when Bennie Davis got elected. The Hog sent for him and after making Bence believe that he was the dearest friend he had, asked him for a favor and the favor was that John Feeney should be janitor of No. 19 school. Ezra (Hog) Ripple then enacted a splendid piece of acting, was so horrified that he got up and flew around the room. But, Mr. Editor, there is nothing too low, too devilish, too despicably mean for this fellow to do to vent his spleen should any one dare to cross the peurile

ambitious ass.    The Hog with his gagged newspaper is not in it with you."

At the trial the trial judge excluded the following offers made by defendant:

[We propose to prove by the witness on the stand that in 1897, when one Pryor was a candidate for the office of sheriff, and one Kelly was a candidate for treasurer, the witness called on Ezra Ripple with a letter of introduction to him from Pryor; that Ripple promised him, the witness, that if he would support Pryor for sheriff, he, the witness, would get a place in the jail of Lackawanna county.    Further, that he gave the witness $10.00 for the further consideration that he would support Pryor who was running on the Republican ticket for sheriff, and Kelly, who was running on the Democratic ticket for treasurer of the county.    The purpose of this is to show that the publication in question was justifiable and warranted under the constitution and statutes of our state, to be followed by evidence that these facts were communicated to the defendants before the publication in question.    This is offered for the further purpose of rebutting malice, or rebutting any inference that the publication was negligently made, it appearing in the evidence that Ezra H. Ripple was postmaster for the last year or two. This is offered for the further purpose of explaining the motive for which the publication was made, and to rebut any inference of malice.

The offer is objected to as irrelevant, immaterial and incompetent, there being no evidence to show that there was any privileged occasion for the publication in question.

The Court: Taking into consideration the character of the publication complained of, and the evidence in the case, we are of the opinion that the publication set forth in the indictment is not a privileged publication; it does not come within the protection of the 7th section of article 1 of the declaration of rights. The objection is sustained; the evidence is rejected.

Exception noted for defendants at whose request a bill is sealed.] [1]

[The defendants offer to show by the witness on the stand that during the time of the Kelly-Langstaff election, in 1897, the prosecutor, Ezra H. Ripple, sent for the witness on the stand and met him in his office, had an interview with him, and at

that interview he instructed the witness on the stand to support M. J. Kelly, a Democrat, for the office of county treasurer, and C. E. Pryor, a Republican, for the office of sheriff; that he paid him the sum of $10.00 for the purposes above indicated, and the promise of a position in the county jail as keeper or warden of the county jail. This for the purpose of proving the truth of the allegations contained in the alleged libelous article, to be followed by evidence showing that at the time the alleged libel was printed the Crawford county system of electing candidates, which had been adopted by the Republican convention one year ago was under consideration; that the general public was in a state of ferment over that question, and also at the same time the question of the nomination of officers for the offices of county commissioners and county auditors was then before the public, being daily discussed in the public press and considered by the general public. This for the purpose of showing that the matter was proper for public information.

It is objected to as a whole as immaterial, irrelevant and incompetent, it not appearing that the occasion for such publication was privileged, or that the matter thereof was privileged. The objection is sustained.] [2]

Defendant being on the stand the court, under objection by defendant, permitted the following question to be asked and answered:

["Q. Are you a citizen of this commonwealth? A. I am not."
Mr. Lenahan: We object to this.

The Court: I overrule the objection.] [9]

The defendant submitted among others the following point:

[3. Probable cause is a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person is guilty of the conduct imputed to him. And if from all the evidence in the case the jury believe that the defendants had probable cause to believe that the charges in the indictment alleged were true, then the question of both malice and negligence are excluded from the case. *Answer:* Refused.] [8]

The court charged the jury in part as follows:

[If through carelessness and the want of proper investigation he libels an individual he is guilty, although he did not

intend to publish a libel.] [4] . . . . [I do not see how you can avoid the conclusion that this article is libelous, and that it tends to blacken the reputation of the prosecutor and to expose him to public hatred and contempt. An examination and analysis of the article will satisfy you on this subject.] [5] . . . .

[No jury can avoid the conclusion that to proclaim a man a coward, a hypocrite, a debaucher of politics and a false pretender tends to expose the man to public contempt and hatred.] [6] . . . .

[I have already called your attention to other charges tending to hold the prosecutor before the public as a coward and a false pretender. Is there any evidence in the case which tends in any way to justify these accusations or to rebut the presumption of malice which attaches to their publication? I can find none myself. If there is none then regardless of the charges in connection with the corrupt use of money in politics, the defendant, Little, may be convicted as he charged in this indictment.] [7]

Verdict of not guilty as to M. J. O'Toole. Verdict of guilty as to Richard Little and sentence thereon to pay a fine of $200 to the commonwealth, to pay costs of prosecution, and to undergo imprisonment in the county jail for a term of six months. Defendant appealed.

*Errors assigned* were (1, 2, 9) to rulings on evidence, reciting same. (3) In declaring in the presence and hearing of the jury, as follows, to wit: "Hon. Judge ARCHBALD: Q. Mr. Lanahan, was the object of the article to give information to the public? A. Yes, sir. Hon. Judge ARCHBALD: From the reading of it I would draw the inference that it was written not for information but for the purpose of vilifying the prosecutor." (4–7) To portions of the judge's charge, reciting same. (8) Refusal to charge as requested in defendant's third point, reciting same.

*Cornelius Smith* and *John T. Lenahan,* with them *J. Stanley Smith,* for appellant.—In Pennsylvania prosecutions for libel are divisible into three classes:

1. Cases falling within the protection of section 7, article 1 of the constitution.

636, (1900).]                    . Arguments.

2. Cases falling within the protection of a common law privilege.

3. Cases not falling within the protection of either the constitution or a common-law privilege.

The principal question is, whether the subject-matter of the alleged libel, or any part thereof, is upon its face, proper for public information. In determining this question for the sole purpose of fixing the nature and scope of defense, can the judge look beyond the character of the matter itself, and upon either intrinsic or extrinsic evidence rule that the case is not within the constitution?

The judge cannot rule on whether the occasion is privileged or not, until after the defendant has called all his witnesses: Hancock v. Case, 2 F. & F. 710.

In Com. v. Swallow, 8 Pa. Superior Ct. 539, 604, it is said: "An inquiry into the official conduct of officers or men in a public capacity or into any other matter proper for public investigation or information, presents a proper occasion. A proper motive and manner exclude malice both in purpose and phrase. Probable cause for belief excludes negligence."

If the matter is proper for public information, good faith is presumed: Briggs v. Garrett, 111 Pa. 404; Gray v. Pentland, 2 S. & R. 424; Chapman v. Calder, 14 Pa. 365; Pittock v. O'Niell, 63 Pa. 253.

After the learned president judge had expressed in the hearing of the jury so strong an opinion of the defendant's guilt, it is submitted that all subsequent proceedings were not a judicial trial, i. e., not a trial in accordance with the "due process of law," one of which requests is a "trial before a fair and impartial judge."

In a criminal prosecution for libel the court is "not bound to express their opinion to the jury, as to whether the publication is libelous, and if they do, their opinion is not binding on the jury:" Pittock v. O'Niell, 63 Pa. 253. When the court did express their opinion, it is submitted that they should have told the jury that it was not binding upon them.

In the case in hand the learned judge's opinion is not even predicated on the evidence, but upon his own inferences from it, viz: the truth of the innuendoes.

It is for the jury to say whether the meaning averred in the

innuendo expresses the true meaning of the word. If there be anything on the face of the libel to give color to the innuendo it must be left to the jury: Com. v. Keenan, 67 Pa. 203.

In criminal libel it is not merely, has the defendant uttered words that have simply injured the prosecutor? The question is, has the commonwealth been injured? Has the injury to the prosecutor been so great that the commonwealth is called upon to hold the defendant liable therefor?

In Hurd v. The People, 25 Mich. 405, it is said: " The only legitimate object of the prosecution is to show the whole transaction as it was.

*E. C. Newcomb* and *Joseph O'Brien*, with them *John R. Jones*, district attorney, for appellee.—Let us briefly discuss the status of the law of libel in Pennsylvania, and first of all let us look at the Act of March 31, 1860, P. L. 382, sec. 24, which provides as follows:

" If any person shall write, print, publish or exhibit any malicious or defamatory libel, tending either to blacken the memory of one who is dead, or the reputation of one who is dead, or the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule," etc.

It is said by the commissioners who prepared the penal code of Pennsylvania, that this section merely puts the common-law definition for a malicious and defamatory libel in statutory form, the object of the commissioners being to assign this crime a place in the statute laws, in order to admonish and instruct. See 1 Shields's Penal Code of Penna. 60, Com. v. Murphy, 8 Pa. C. C. R. 399, and 4 Bl. Com. 151.

In 2 Wharton, Cr. L. (9th ed.) sec. 643, it is said: " At common law the general rule is that the truth is inadmissible as a defense in a criminal prosecution for libel." See also 2 Bish. Cr. Law (7th ed.), 918, 3 Greenleaf on Evidence. 198, and Com. v. Blanding, 20 Mass. 304.

The statute in Pennsylvania being the same as common-law libel it follows that the truth of the charge in a publication is not available as a defense, and it has been so held in very many cases: Pittock v. O'Niell, 63 Pa. 253; Com. v. Brown, 30 W. N. C. 320.

Such being the meaning of the publication, evidence that the

prosecutor had the reputation of being a briber would not be admissible for any purpose: Fitzgerald v. Stewart, 53 Pa. 343; Lukehart v. Byerly, 53 Pa. 418; Pease v. Shippen, 80 Pa. 513.

At common law the truth of the libel is not a defense to a criminal prosecution: 4 Bl. Com. 150; Russell, Cr. 597; 2 Wh. Cr. L. 1643; Com. v. Snelling, 32 Mass. 337; Com. v. Costello, 1 Pa. Dist. Rep. 745.

The moment privilege is denied we have nothing to do with actual malice or innocent intent. All that is then to be shown is legal malice, which is implied from the intentional publication of a libel: Odgers, L. & S. 269; Barr v. Moore, 87 Pa. 385; Brueshaber v. Hertling, 78 Wis. 498.

Again in the case of Com. v. Telford, 32 Pitts. Leg. Jour. 422, and in 6 Crim. Law Mag. 584, the same principle is followed. The case was tried by Judge WICKHAM and it was held that "the legal inference of malice attaching to a libelous publication, which is not privileged under the constitution, cannot be rebutted by evidence."

Are the articles in question privileged under the constitution? A privileged communication is one made upon a proper occasion, from a proper motive, in a proper manner, and based upon reasonable cause. This definition has been followed in all of the cases, both civil and criminal, from Briggs v. Garrett, 111 Pa. 404, down to Com. v. Swallow, 8 Pa. Superior Ct. 539. It seems to us that it requires little to be said to convince this court that no proper occasion presented itself to warrant this publication.

It is said in Com. v. Moore, 2 Pa. C. C. R. 358: "In deciding whether the matter was one proper for public investigation or information, the jury should take into consideration the mode in which, the time at which, and the occasion on which it was made public. It may be proper at one time and not at another."

In Com. v. Brown, 30 W. N. C. 322, Judge HENDERSON says: "Thus far no reference has been made to the manner in which the publication was made. To the most casual reader it is apparent that it was not instigated by motives of public interest, and its apparent object was to subject the prosecutor to public ridicule." See also Pittock v. O'Neill, 63 Pa. 253, and Neeb v. Hope, 111 Pa. 145.

In Conroy v. Times, 139 Pa. 334, it is said, "If the manner be improper the privilege is lost."

The third assignment of error is directed to some remarks alleged to have been made by Judge ARCHBALD. The record in this case shows that it was Judge EDWARDS who tried the case, not Judge ARCHBALD. This assignment cannot be considered by this court for the reason that the remarks complained of nowhere appear in the record of this case, and an examination of the record fails to show any reference whatever to them. The statement in the appellant's history of the case, that they were made within the hearing of the jury, is not supported by evidence and is not true as a matter of fact. If any such remarks were made, it was the duty of counsel for appellant to have them placed upon the record after they were made, and to have their exceptions noted to them at that time, and the fact that they did not is very convincing that any remarks that might have been made by Judge ARCHBALD were looked upon by them in a trivial way. They certainly could not wait until after the verdict in the case was rendered and then complain. The first that was heard of them was upon the motion for a new trial, and then counsel for appellant stated they did not hear the remarks of Judge ARCHBALD, and the only evidence they produced before the court that Judge ARCHBALD made them, was a newspaper clipping purporting to give a report of the trial.

It was said by Mr. Justice SHARSWOOD in Pittock v. O'Niell, 63 Pa. 253, "There can be no doubt that both in criminal and civil cases the court may express to the jury their opinion as to whether the publication is libelous." To the same effect are Com. v. Willard, 9 W. N. C. 524, and Com. v. Moore, 2 Chester Co. Rep. 358.

Indeed, the cases have gone so far in Pennsylvania that it is not only the right of the court to express their opinion, but in some cases it is their duty to do so: Price v. Hamscher, 174 Pa. 73; Repsher v. Watson, 17 Pa. 365.

A word as to the rulings of the court as disclosed by the record. It will show that after deciding that the publication in this case was not privileged, and after ruling that the truth of the charges was inadmissible as a defense to the libel, the court permitted the appellant to show upon what information he acted

in publishing the articles in question for the purpose of rebutting malice.    To this the commonwealth objected, and while we still think that this was giving the appellant much more than he was entitled to, it demonstrates clearly with what fairness and care the court tried this case.    Again in the charge of the court, throughout it all, every right that the appellant could possibly lay claim to was protected.    Every particle of evidence that was offered by the defense was most favorably commented upon.    Every principle of law in his favor was prominently discussed by the court in his charge to the jury.    In short the appellant received a fair and impartial trial, and he should not be now heard to complain of a result in his trial that he, by his own conduct, made unavoidable.

OPINION BY BEAVER, J., February 16, 1900:

The appellant, who was indicted with a codefendant for libel, in the court below, was convicted upon an indictment which is printed in the paper-book of the appellee, charging a libel based upon two newspaper articles, the one an editorial written by himself, and the other a communication which he received and directed to be published.    Each of these newspaper articles is easily and naturally divisible into two distinct parts.    The defendant himself, in his cross-examination, seems to admit this, and his admission would seem to relieve us of the apparent difficulties which are presented by the assignments of error.    We quote from the defendant's cross-examination as follows:

" Q. Did you print for the benefit of the public and for the purpose of purifying the politics of this community these words, among others : ' Col. Ripple, the man who struts around as an old soldier, although he never fought in the war—the man who was captain of the firing squad that shot down the strikers on Lackawanna avenue twenty-two years ago, but was absent in a cellar or somewhere else when the fighting was in progress— Col. Ripple, the man who, as Connellism's chief director, has done more to debauch politics in this county than any one else, and the man who, in spite of the fact that he holds office as a republican, has done all that lay in his power to defeat the party he benefits by—this man, who is literally steeped in political corruption and blackest hypocrisy, has we understand given orders to the editor of the Scranton Tribune that he is to fight us

to the bitter end?' A. The part referring— Q. Answer my question. A. I can't answer it as a whole. It splits itself naturally into two parts. Q. Well, answer it your own way then. A. The part referring to the politics, yes, and the introduction as a description of the man as I understand he existed. Q. The part referring to the politics, yes, but the other part, no? A. It describes the man, as I understood it. Q. You describe him as you understood him? A. Yes, sir. Q. Did you print those words for the purpose of purifying the politics of the community? You say the part referring to the politics, yes, but the other part, no? A. Well, you can put it that way."

Admitting all that is claimed by the defendant's counsel as to the privileged character of the communications contained in the indictment under the 7th section of the 1st article of the constitution, which provides that " No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury;" and that the portions of these articles which deal with facts may be privileged, it is impossible to see how the parts which the defendant says are descriptive of the man can be other than libelous. Giving the largest possible latitude to the defendant's contention and admitting that, because the prosecutor was postmaster of the city of Scranton and there was at the time of the publication of the libel under discussion in the newspapers and under consideration by the people a change in the method of conducting their primary elections, and that the prosecutor was prominent in political circles in the community and that, therefore, everything relating to his political methods in times past was the proper subject of discussion and comment, so that the public might be advised of his character as a political leader, and admitting that the articles alleged to be libelous were made upon a proper occasion, from a proper motive and based upon reasonable or probable cause, it can scarcely be alleged and has not been claimed that they were made in a proper manner; but even in a civil case, as was held in Conroy v. The Times, 139 Pa. 334, " if the manner be improper, the privilege is lost." It is not necessary to characterize the manner in which

whatever of fact contained in both the editorial and the communication referred to is conveyed to the public. The most casual observer will be impressed with the motive of these publications. As the defendant himself observed in the cross-examination heretofore quoted, "They split themselves naturally into two parts," the one part of fact and the other of exuberant fancy or rather vituperation. The public teacher who, in the effort to reform abuses existing in the community, attempts to give to the public the facts in relation to the life, character or conduct of public men must do so in a manner befitting the purpose which he has in mind and the object to be attained. It may be admitted that the public journalist of to-day can have no more lofty purpose and perform no higher duty to the public than to point out in a manner befitting the dignity of the high purpose which he has in view, the political corruptions of the day and the men who practice them; but, when such a task is undertaken, it is to be performed in such a manner as to bring the teacher clearly within the privilege guaranteed to him under the constitution. There has been and can be no pretense that either of the communications, upon which the indictment in this case was founded, was in effect or was intended to be a proper presentation of a grave charge against a citizen of the commonwealth, whose conduct as a public man and an office holder was the proper subject "for public investigation or information." What is complained of, therefore, in the third, fourth, fifth, sixth and seventh assignments of error was clearly justified by the character of the publications contained in the indictment.

The first and second assignments of error, upon their face, seem to present a question of some difficulty, but the answer thereto is twofold: (1) The testimony offered therein could not in any way tend to justify the manner of the publications, even if all else in them taken together could be considered as bringing them within the category of privileged communications, but (2) all the facts offered to be proved in the offers which were rejected were afterwards admitted and the fullest latitude given to the defendant to prove the truth of the facts alleged in both of the articles. It is true that in the third offer, which was admitted, the purpose of the offer differed from those contained in the offers rejected, but the purpose was

in no way controlled, so far as the record shows, by the court after the testimony was in, and the defendant would seem to have had all the benefit of the testimony which he could have had, if it had been received under the offers, the rejection of which is complained of in the first and second assignments of error.

The answer to the defendant's third point might have been different, if the publications complained of had consisted merely of statements of fact properly communicated to the public; but, under the circumstances, and in view of the character of these publications, as already pointed out, we can see no error in the refusal of this point.

The admission of the fact as to the citizenship of the defendant, complained of in the ninth assignment of error, may not have been technically correct. We do not see what relevancy that fact had to the main issue; nor, on the other hand, do we see how the defendant was harmed thereby. There seems to have been some latitude allowed both on the part of the prosecution and the defense in regard to this subject, for the defendant, apparently as an offset to the fact that he was not a citizen, was allowed to prove that he had two children who were citizens. We do not think this constitutes in the present case reversible error.

The case was fairly, fully and ably tried. The charge of the court was entirely adequate. We have given careful consideration to all of the testimony and to the whole case as presented, both by the appellant and the appellee. The appellant's paper-book, it may be remarked, omitted some of the exhibits which were in evidence, but that of the appellee seems to supply the deficiencies existing therein and we have, therefore, been able to reach a clear understanding of the entire case and, upon a careful consideration of it, there is no ground, so far as we can see, in any of the assignments of error for a reversal of the judgment of the court below. They are, therefore, all overruled and the judgment is affirmed.